HMO-W Incorporated, a Wisconsin corporation,
Plaintiff-Respondent-Cross-Appellant,

v.

SSM Health Care System, a foreign corporation,
Defendant-Appellant-Cross-Respondent,

Neillsville Clinic, S.C., a Wisconsin corporation,
Defendant.

Court of Appeals

*No. 02–0042. Submitted on briefs September 10, 2002.—
Decided June 12, 2003.*

2003 WI App 137

(Also reported in 667 N.W.2d 733.)

71

On behalf of the defendant-appellant-cross-respondent, the cause was submitted on the briefs of *Peter B. Ritz* of *Ritz & Caflisch, S.C.*, Madison, and *Earl H. Munson* of *Boardman, Suhr, Curry & Field, LLP*, Madison.

On behalf of the plaintiff-respondent-cross-appellant, the cause was submitted on the briefs of *Thomas M. Pyper* and *Cynthia L. Buchko* of *Whyte, Hirschboeck, Dudek, S.C.*, Madison.

Before Dykman, Roggensack and Lundsten, JJ.

¶ 1. LUNDSTEN, J. SSM Health Care System successfully exercised its dissenters' rights under WIS. STAT. ch. 180 against HMO-W. SSM appeals a judgment awarding it money damages plus interest under WIS. STAT. § 180.1301(5) (1991–92).[1] SSM contends that the circuit court should have applied, post-decision, the 12% interest rate specified in WIS. STAT. § 814.04(4), rather than interest as defined in § 180.1301(5). We disagree, and affirm the circuit court. On cross-appeal, HMO-W contends that the circuit court correctly looked

---

[1] All references to the Wisconsin Statutes are to the 1991–92 version unless otherwise noted.

to the "fair and equitable" interest rate language found in § 180.1301(5), but erroneously applied that language by failing to consider and use an interest rate based on rates paid by HMO-W's subsidiary. We agree with part of HMO-W's argument. We conclude that the circuit court misused its discretion when applying § 180.1301(5), and remand for a new interest determination under that statute.

## *Background*

¶ 2.  HMO-W is a holding corporation created to own the stock of Unity Health Plans Insurance Corporation.[2] Prior to and on October 31, 1994, SSM was a minority shareholder of HMO-W. On October 31, 1994, HMO-W merged with UWS Acquisition Corporation, which is owned by Cobalt Corporation. HMO-W was the surviving entity after the merger, and continues as a holding corporation for Unity. HMO-W is now owned by Cobalt.

¶ 3.  SSM voted against HMO-W's merger with UWS Acquisition and successfully asserted its dissenters' rights under WIS. STAT. ch. 180. Accordingly, SSM was entitled to compensation based on the value of SSM's shares at the time of the merger, October 31, 1994. On January 26, 1995, HMO-W paid SSM $1,456,348.48 ($1,427,760.00 as fair value, plus $28,588.48 in interest), an amount HMO-W contended

---

[2] At the time of its creation, HMO-W owned HMO of Wisconsin Insurance Corporation which later came to be known as Unity Health Plans Insurance Corporation. Although the parties dispute whether Unity is a successor entity to HMO of Wisconsin Insurance Corporation, they have failed to persuade us that this dispute is relevant to the issues before us. Accordingly, there will be no further reference to HMO of Wisconsin Insurance Corporation in this opinion.

included the fair value of SSM's stock on October 31, 1994, plus interest to January 26, 1995. SSM disputed the amount, and HMO-W initiated a "special proceeding" pursuant to Wis. Stat. § 180.1330. The dispute over the fair value of the stock has been resolved. It has been determined that HMO-W's January 26, 1995, payment was insufficient, and the parties agree that HMO-W owes SSM $601,232.94, plus interest from October 31, 1994.[3]

¶ 4. On remand, the circuit court addressed the interest component of the amount owed by HMO-W. The court applied the "fair and equitable" language from Wis. Stat. § 180.1301(5) and concluded that HMO-W should pay interest based on the prime rate.[4] The circuit court found that the prime rate "is well accepted as an index figure in many commercial situations" and "reflects the cost of money to corporate borrowers." The circuit court ordered HMO-W to pay interest at a rate calculated by determining the average prime rate from the valuation date, October 31, 1994, to the "date of final payment." Both SSM's appeal and

_____

[3] When HMO-W and SSM disputed the value of the SSM shares as of October 31, 1994, the circuit court determined a value. At that point in the case, Neillsville Clinic was also a dissenting shareholder. SSM, but not Neillsville Clinic, appealed and the supreme court eventually resolved the value issue and the matter was returned to the circuit court. *HMO-W, Inc. v. SSM Health Care Sys.*, 2000 WI 46, 234 Wis. 2d 707, 611 N.W.2d 250, *aff'g* 228 Wis. 2d 815, 598 N.W.2d 577 (Ct. App. 1999). After remand, HMO-W made an $829,167.51 payment to SSM, and the circuit court judgment gives HMO-W credit for that payment.

[4] The circuit court's order provides an exception for time periods during which HMO-W had outstanding bank loans, but this exception is a nullity because the parties agree that HMO-W did not borrow money during the relevant time period.

HMO-W's cross-appeal concern the circuit court's application of the interest language in § 180.1301(5) to the fair value underpayment of $601,232.94.

## Standard of Review

¶ 5.    The resolution of both the appeal and the cross-appeal requires interpretation of WIS. STAT. § 180.1301(5). The construction of a statute is a question of law which we review without deference to the circuit court. *DeMars v. LaPour*, 123 Wis. 2d 366, 370, 366 N.W.2d 891 (1985). We first look to the language of the statute and attempt to interpret it based on "the plain meaning of its terms." *State v. Williquette*, 129 Wis. 2d 239, 248, 385 N.W.2d 145 (1986). Only when statutory language is ambiguous may we examine other construction aids such as legislative history, context, and subject matter. *State v. Waalen*, 130 Wis. 2d 18, 24, 386 N.W.2d 47 (1986). A statute is ambiguous if reasonable persons could disagree as to its meaning. *Williquette*, 129 Wis. 2d at 248. "When construing statutes we are to give them their common-sense meaning to avoid unreasonable and absurd results." *Janssen v. State Farm Mut. Auto. Ins. Co.*, 2002 WI App 72, ¶ 16, 251 Wis. 2d 660, 643 N.W.2d 857.

## SSM's Appeal

*The Interest Rate Provision Applied to Payments*
*Made Pursuant to a Special Proceeding*

¶ 6.    We begin with a brief summary of the applicable provisions of the dissenters' rights statutes. When, as here, a dissenting shareholder successfully exercises dissenters' rights under WIS. STAT. ch. 180,

including a demand for payment that meets the criteria in Wis. Stat. § 180.1323, the corporation must make a payment to the dissenting shareholder equal to "the amount that the corporation estimates to be the fair value of his or her shares, plus accrued interest," calculated from the date the challenged "corporate action is effectuated" or from the date of "receipt of a payment demand," whichever is later. Wis. Stat. § 180.1325(1). If, as here, the dissenting shareholder disagrees with the amount of the corporation's payment, the dissenter may notify the corporation of the dissenter's estimate of the fair value of the shares and demand payment under Wis. Stat. § 180.1328. If that demand remains unsettled, the corporation must "bring a special proceeding" in the circuit court within a specified time limit and petition the court "to determine the fair value of the shares and accrued interest." Wis. Stat. § 180.1330(1). In the case before us, HMO-W opted to bring a special proceeding in the circuit court.

¶ 7.   If a circuit court finds that a corporation has underpaid, the dissenter is entitled to a judgment in the "amount . . . by which the court finds the fair value of his or her shares, plus interest, exceeds the amount paid by the corporation." Wis. Stat. § 180.1330(5)(a). As noted above, it was judicially determined that HMO-W underpaid SSM and that HMO-W should pay SSM $601,232.94, plus interest on that amount from October 31, 1994, the corporate action effectuation date.

¶ 8.   The parties disagree on the application of statutory provisions governing interest and our attention is directed to the following statutory provisions. Wisconsin Stat. § 180.1301 provides definitions for terms used in §§ 180.1301 to 180.1331. Section 180.1301(5) defines "interest":

> "Interest" means interest from the effectuation

77

date of the corporate action until the date of payment, at the average rate currently paid by the corporation on its principal bank loans or, if none, at a rate that is fair and equitable under all of the circumstances.

Section 180.1331, entitled "Court costs and counsel fees," provides:

(1)(a) Notwithstanding ss. 814.01 to 814.04, the court in a special proceeding brought under s. 180.1330 shall determine all costs of the proceeding, including the reasonable compensation and expenses of appraisers appointed by the court and shall assess the costs against the corporation, except as provided in par. (b).

WISCONSIN STAT. §§ 814.01 to 814.04 contain various provisions relating to costs. Of particular note here is § 814.04(4), which applies to the time period between a decision and the entry of judgment:

Except as provided in s. 807.01(4), if the judgment is for the recovery of money, interest at the rate of 12% per year from the time of verdict, decision or report until judgment is entered shall be computed by the clerk and added to the costs.

In addition, though not mentioned by either party, WIS. STAT. § 815.05(8) contains the generally applicable post-judgment interest rate on unpaid money judgments. It provides:

Except as provided in s. 807.01(4), every execution upon a judgment for the recovery of money shall direct the collection of interest at the rate of 12% per year on the amount recovered from the date of the entry thereof until paid.

78

¶ 9.   The parties agree that the interest provision in Wis. Stat. § 180.1301(5) applies to the time between the corporate action effectuation date and the date the circuit court makes a decision regarding the fair value of the shares in a special proceeding under Wis. Stat. § 180.1330.[5] We are asked to resolve whether the interest language in § 180.1301(5) or the 12% rate contained in Wis. Stat. § 814.04(4) applies to the time between the circuit court's decision regarding fair value and the date the corporation actually tenders payment.

¶ 10.   SSM's reasoning is as follows:

(1)    Under § 180.1330(1), a circuit court in a special proceeding is required to determine "the fair value of the shares and accrued interest." Pursuant to this language, a circuit court must determine both the fair value of the shares and the dollar value of the accrued interest, if any, as of the date the fair value is determined.

(2)    If the circuit court, in applying § 180.1330, determines that the corporation underpaid, § 180.1330(5) directs that the dissenter is en-

---

[5] Section 180.1330(1) provides:

If a demand for payment under s. 180.1328 remains unsettled, the corporation shall bring a special proceeding within 60 days after receiving the payment demand under s. 180.1328 and petition the court to determine the fair value of the shares and accrued interest. If the corporation does not bring the special proceeding within the 60–day period, it shall pay each dissenter whose demand remains unsettled the amount demanded.

Section 180.1330(5) provides, in part:

Each dissenter made a party to the special proceeding is entitled to judgment for any of the following:

(a) The amount, if any, by which the court finds the fair value of his or her shares, plus interest, exceeds the amount paid by the corporation.

79

titled to a judgment in that amount. That is, the subsequent judgment should equal the underpayment determined on the decision date, which includes the dollar value of the accrued interest as of that date.

(3)  Once the circuit court has determined the "fair value of the shares and accrued interest," the definition of interest in § 180.1301(5), including the words "date of payment," no longer applies. Instead, the general statutory interest provisions apply, namely § 814.04(4), requiring 12% interest on a money judgment from the date of the circuit court's decision until final payment.

¶ 11. We begin by rejecting SSM's assertion that, pursuant to § 180.1330(1),[6] a circuit court must determine the *dollar value* of the accrued interest, if any, as of the date the fair value is determined. Section 180.1330(1) does not say that a court must determine the specific amount of interest owing as of the date the court decides the fair value of the stock. It may be that the circuit court must address interest owing on the decision date, something we need not decide, but determining "accrued interest" can be done in terms of selecting an interest rate and applying it to a time period, even if the end date for the time period is not known. Thus, the circuit court's order that HMO-W pay interest at a specified rate from October 31, 1994, to the "date of final payment" does not run afoul of § 180.1330(1).

[6] Due to the volume of statutory references in this opinion, in the remainder of this opinion we dispense with this court's usual practice of adding "Wis. Stat." each time a statute is cited in a new paragraph.

80

¶ 12. We now turn our attention to § 180.1301(5), which states that interest, as defined in that statute, applies "from the effectuation date of the corporate action until the *date of payment*" (emphasis added). We agree with HMO-W that the only reasonable reading of this language is that it unambiguously refers to any date a corporation, pursuant to §§ 180.1301 to 180.1331, makes a payment for the purpose of compensating a successful dissenter for the value of the dissenter's stock.

¶ 13. Similar language was considered in *Weiland v. Department of Transportation*, 62 Wis. 2d 456, 215 N.W.2d 455 (1974). The *Weiland* court was asked to determine which interest rate applied from verdict to actual payment:

(1) the statutory interest rate applicable from verdict to judgment, WIS. STAT. § 271.04(4) (1971) (the predecessor statute to § 814.04(4)),[7] or

(2) the interest rate contained in WIS. STAT. § 32.05(11)(b) (1969).

*Weiland*, 62 Wis. 2d at 460–62. Section 32.05(11)(b) (1969) provided: "If the jury verdict as approved by the court exceeds the basic award, the appellant shall have judgment for the amount of such excess plus legal interest thereon to date of payment in full from that

---

[7] WISCONSIN STAT. § 271.04(4) (1971) was at issue in *Weiland*. It read: "INTEREST ON VERDICT. When the judgment is for the recovery of money, interest at the rate of 7% per annum from the time of verdict, decision or report until judgment is entered shall be computed by the clerk and added to the costs." Chapter 271 was renumbered chapter 814. *See In re Rules of Civil Procedure*, 67 Wis. 2d 585, 761 (1975).

date which is 14 days after the date of taking . . . ." The *Weiland* court concluded that the phrase "to date of payment in full" in § 32.05(11)(b) "applies until the judgment is paid in full." *Weiland*, 62 Wis. 2d at 462. We find no relevant distinction between the statutory phrase "to date of payment in full," at issue in *Weiland*, and the statutory phrase at issue here, "until the date of payment." Both are used to apply an interest rate to a specific situation, and both plainly speak in terms of actual payment.

¶ 14. At paragraph 58, Judge Roggensack's dissent contends that our reliance on *Weiland* is misplaced. Her dissent apparently reasons that § 32.05(11)(b)'s reference to the "jury verdict" as a starting point for the application of interest (something not present in § 180.1301) removes any ambiguity that § 32.05(11)(b)'s interest rate applies after a judicial determination. However, the "jury verdict" language does not explain why the specified interest rate applies after entry of judgment. The language "to date of payment in full" is no clearer with respect to the time period after entry of judgment than is § 180.1301(5)'s "date of payment" language with respect to time periods post-decision. In both cases, the legislature has unambiguously directed interest to run until payment, even if the date of payment follows a decision or judgment.

¶ 15. As noted, the parties do not discuss the postjudgment interest rate statute, § 815.05(8), but *Weiland* also disposes of any claim that § 815.05(8) overrides the § 180.1301(5) interest provision. To repeat, the court in *Weiland* concluded that the phrase "to date of payment in full" "[b]y its terms . . . applies until the judgment is paid in full." *Weiland*, 62 Wis. 2d at 462. Thus, although *Weiland* does not mention the postjudgment interest rate statute, it unambiguously holds that

the postjudgment interest rate statute does not apply in the face of a more specific interest rate statute that applies "to date of payment in full."

¶ 16. We observe that in *Burlington Northern Railroad Co. v. City of Superior*, 159 Wis. 2d 434, 464 N.W.2d 643 (1991), the supreme court concluded that "sec. 815.05(8) establishes the postjudgment interest rate for every judgment for which the legislature has not explicitly provided a different postjudgment interest rate." *Id.* at 442. *Burlington Northern* is arguably inconsistent with *Weiland* because it can be said that former § 32.05(11)(b) does not "explicitly" say it takes precedence over the postjudgment interest rate statute. But *Burlington Northern* does not say the more specific statute must expressly reference and override the postjudgment interest rate statute. Rather, the decision says "sec. 815.05(8) establishes the postjudgment interest rate for every judgment for which the legislature has *not explicitly provided a different postjudgment interest rate.*" *Burlington Northern*, 159 Wis. 2d at 442 (emphasis added). The *Weiland* court effectively concluded that the legislature had provided a different postjudgment interest rate by using the language "to date of payment in full." *See Weiland*, 62 Wis. 2d at 462.[8]

¶ 17. Our conclusion that § 180.1301(5) interest applies is supported by the Maine Supreme Judicial Court's interpretation of its version of § 180.1301(5) in its dissenters' rights statutes. In *In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d 997 (Me.

---

[8] Notably, a post-*Burlington Northern* case, *Calaway v. Brown County*, 202 Wis. 2d 736, 553 N.W.2d 809 (Ct. App. 1996), confirms that § 32.05(11)(b) is a statute that "explicitly" addresses postjudgment interest within the meaning of the *Burlington Northern* test. *See Calaway*, 202 Wis. 2d at 758.

1989), the Maine court construed the same phrase as contained in our dissenters' rights statute, "to the date of payment," and concluded it "means precisely what it says. The word 'payment' cannot be read [as] 'judgment.' " *Id.* at 1008.[9]

¶ 18. Judge Roggensack's dissent characterizes the question presented as follows: "whether the § 180.1301(5) definition of interest [applicable to the judicial proceedings in this case under § 180.1330(5)] applies only to prejudgment interest or whether it also applies after a judicial determination of fair value." Roggensack Dissent at ¶ 48. However, her dissent does not go on to conclude that the definition of interest in § 180.1301(5) applies to prejudgment interest, or even that it applies up to the time there is a "judicial determination of fair value." Rather, her dissent concludes that the phrase "date of payment" in § 180.1301(5) has the same meaning as "date of payment" in § 180.1325(2)(a), that is, the date on which a corporation makes a payment of principal and interest in an effort to avoid a dispute or the involvement of the courts. Roggensack Dissent at ¶ 54. Notably, Judge Roggensack's dissent makes no attempt to construe "date of payment" in § 180.1301(5)'s definition of interest as including the date of a judicial determination of

---

[9] We note that when the issue is whether contract language trumps statutory postjudgment interest, the analysis may be different. That is, a contract may need to be more explicit to override statutory postjudgment interest. *See Production Credit Ass'n v. Laufenberg*, 143 Wis. 2d 200, 204, 420 N.W.2d 778 (Ct. App. 1988) (when the question is whether statutory postjudgment interest overrides contract interest, the "merger doctrine" provides that statutory interest controls over contract interest in "the absence of an express agreement otherwise"). We do not, however, weigh in on that topic.

84

fair value, the position advanced by SSM. Thus, her analysis leaves a gap: the time between the "date of payment" under § 180.1325 and a judicial determination of fair value. In this case, HMO-W made a payment under § 180.1325 on January 26, 1995, and the circuit court reached its initial decision on fair value on October 16, 1997. Under Judge Roggensack's construction, there is no apparent reason why HMO-W is required to pay interest at all for this thirty-three-month period. It would be incongruous for the legislature to have set an interest rate reflecting the time value of money for the initial period between the corporate action and the § 180.1325 payment date, typically a short time period, and not compensate a dissenter for the time value of money during potentially protracted judicial proceedings. In fact, a gap without interest accruing would encourage litigation because it would provide an incentive for corporations to tender an insufficient payment as quickly as possible, and then have access to dissenting shareholders' money interest-free during litigation.[10]

¶ 19. Furthermore, we do not attribute a different meaning to the phrase "date of payment" in § 180.1301(5) than to the same phrase in § 180.1325. Both refer to dates payment is actually made, the latter being one of the possible payment dates encompassed in the former.

---

[10] It may be that under Judge Roggensack's reading of the statute, a dissenting shareholder would be eligible for common law pre-verdict interest following a § 180.1325 payment and until a judicial decision is rendered. *See Loehrke v. Wanta Builders, Inc.*, 151 Wis. 2d 695, 706–07, 445 N.W.2d 717 (Ct. App. 1989). But neither the parties nor the dissent discusses this possibility.

¶ 20. In her dissent, Judge Roggensack examines legislative history. Because we find no ambiguity, we do not resort to legislative history. *See Waalen*, 130 Wis. 2d at 24. However, even considering the legislative history recounted in her dissent, we fail to understand how it undercuts our construction of "date of payment." We agree that this history indicates the legislature prescribed an interest rate to aid parties in calculating the fair value and interest due to dissenting shareholders. But the legislature also devised a special proceeding to settle disputes between the parties, and plainly applied the § 180.1301(5) definition of interest to judgments entered under § 180.1330. If § 180.1301(5) is an appropriate interest rate up to the date of payment under § 180.1325, why is it not an appropriate interest rate after that date? How is the application of that interest rate contrary to the legislative scheme if it is applied until the corporation actually makes final payment following a judicial proceeding? Just because the legislature specified the interest rate applicable to voluntary settlements under § 180.1325 does not indicate that the same interest rate should not be used during all proceedings to calculate the interest due dissenting shareholders.

¶ 21. Judge Roggensack's dissent says we "engraft[] the interest definition of Wis. Stat. § 180.1301(5) onto Wis. Stat. § 814.04(4) and Wis. Stat. § 815.05(8)," even though "§ 180.1301 explicitly states that the definitions of § 180.1301 apply only to Wis. Stat. §§ 180.1301 to 180.1331." *See* Roggensack Dissent at ¶ 53. This criticism misses the mark. We do not engraft any definition on to §§ 814.04(4) or 815.05(8). Moreover, we do apply the interest definition in § 180.1301(5) to § 180.1330.

86

¶ 22. Before leaving this topic, we will respond directly to the statutory arguments made by SSM. SSM approaches the topic from a different direction. SSM defines "date of payment" in § 180.1301(5) as referring to two dates: first, a payment date under § 180.1325(1), and, second, the day a circuit court determines the fair value of stock, pursuant to a special proceeding under § 180.1330. The second part of that definition is not a plausible reading of "date of payment" because, as SSM's own discussion of the mechanics of §§ 180.1301 to 180.1331 shows, there is seldom, if ever, a payment on the day a court decides fair value. And, more to the point, nothing in the statutes requires that a decision on fair value and a resulting payment occur on the same day.

■

¶ 23. In a closely related argument, SSM asserts that § 180.1331(1)(a) leads to § 814.04(4)'s 12% interest rate. Section 180.1331(1)(a) provides: "Notwithstanding §§. 814.01 to 814.04, the court in a special proceeding brought under s. 180.1330 shall determine all costs of the proceeding, including . . . ." According to SSM, the term "notwithstanding" means *all* costs under §§ 814.01 to 814.04 are assessed against the corporation, plus, in SSM's words, "two additional requirements: (1) the compensation and expense of court-appointed appraisers are to be included as part of 'all costs' even though Chapter 814 does not so provide; and (2) 'all costs' are normally to be assessed against the corporation, not just to the prevailing party." It follows, according to SSM, that "all costs" in § 180.1331(1)(a) necessarily includes 12% post-decision interest under § 814.04(4). We disagree.

¶ 24. The general reference to §§ 814.01 to 814.04 contained in § 180.1331(1)(a) does not override the

specific definition of interest in § 180.1301(5). We agree with HMO-W that a more specific provision is present here, namely the interest provision in § 180.1301(5). Furthermore, the term "[n]otwithstanding" in § 180.1331(1)(a) means that, despite any contrary provision in §§ 814.01 to 814.04, certain costs are available in a special proceeding. *See Kohler Co. v. Sogen Int'l Fund, Inc.*, 2000 WI App 60, ¶ 14, 233 Wis. 2d 592, 608 N.W.2d 746 ("The procedures and practices explained in WIS. STAT. chs. 801 to 847 govern special proceedings as well as civil actions unless the special procedure statute indicates to the contrary.").

¶ 25. We conclude that there is no statutory support for SSM's assertion that the interest language contained in § 180.1301(5) should be applied up to, but not after, the date the circuit court determines the fair value of stock in a special proceeding.

¶ 26. Finally, SSM argues that the legislature could not have intended to apply the interest definition of § 180.1301(5) to the uncertain time period following a decision under § 180.1330. When faced with plain language, as we are here, we apply that language unless such application would lead to absurd or unreasonable results. *See Gasper v. Parbs*, 2001 WI App 259, ¶ 8, 249 Wis. 2d 106, 637 N.W.2d 399. Thus, we will consider this argument, but only in the context of determining whether SSM has identified an absurd result. SSM points out that judgments are often entered long after circuit courts render decisions. According to SSM, this means courts will unreasonably be called upon to predict an equitable interest rate for an unknown time period. SSM, however, has not explained why predicting

88

an equitable interest rate is inherently inferior to applying the fixed 12% statutory rate found in § 814.04(4).

¶ 27. For all of the reasons above, we conclude that "date of payment" in § 180.1301(5) refers to the actual payment date by a corporation following a special proceeding, even if such payment occurs after a "verdict, decision or report," within the meaning of § 814.04(4), or after "judgment," within the meaning of § 815.05(8). Consequently, the circuit court correctly applied the definition of interest contained in § 180.1301(5) to the time period following its decision on fair value and until final payment is made by HMO-W.

## *HMO-W's Cross-Appeal*

¶ 28. On cross-appeal, HMO-W contends that the circuit court misused its discretion when it rejected use of a low interest rate available to HMO-W's major asset, Unity, and instead used the higher prime rate. HMO-W argues that the circuit court misused its discretion because the court erroneously assumed there was something wrong with using an interest rate that is only available by virtue of a parent corporation's borrowing power. We agree this was an erroneous assumption and remand for a redetermination of the interest rate to be applied.

¶ 29. The starting point for this discussion is the definition of interest in § 180.1301(5), which reads, in pertinent part:

> "Interest" means interest ... at the average rate currently paid by the *corporation* on its principal bank

loans or, if none, at a rate that is fair and equitable under all of the circumstances.

(Emphasis added.) The "corporation" here, HMO-W, had no bank loans during the relevant period and, consequently, the circuit court needed to determine a rate that was "fair and equitable under all of the circumstances."[11] At the same time, it is undisputed that, because of the borrowing power of a corporate parent, HMO-W's major asset, Unity, first could have and later did borrow at a lower interest rate than the prime rate during the relevant time period. This lower interest rate is called the LIBO Rate.[12]

¶ 30. HMO-W argues that the "under all of the circumstances" language of § 180.1301(5) means the circuit court was required to look at the particular circumstances of this case, which include the rate at which Unity could and did borrow money. HMO-W contends it effectively had the power to borrow money at the LIBO Rate because its primary asset, Unity, had

---

[11] The definition of "corporation" is found in § 180.1301(2):

"Corporation" means the issuer corporation or, if the corporate action giving rise to dissenters' rights under s. 180.1302 is a merger or share exchange that has been effectuated, the surviving domestic corporation or foreign corporation of the merger or the acquiring domestic corporation or foreign corporation of the share exchange.

It is undisputed that HMO-W is a corporate entity distinct from Unity, and HMO-W makes no argument that Unity fits any of the definitions found in § 180.1301(2).

[12] We will refer to this favorable rate as the LIBO Rate, but acknowledge that the record indicates the rate is an adjusted LIBO Rate.

that power and, therefore, the circuit court should have considered this fact as favoring use of the LIBO Rate for purposes of § 180.1301(5).

¶ 31. The circuit court rejected HMO-W's argument. It reasoned:

> The fact that HMO-W could have borrowed under its parent corporation is not controlling. If there are no loans, the court must look to fairness and equity. *Transactions between related parties may not be indicative of market factors.* Consequently, the court believes that the most acceptable rate for consideration would be the prime rate. This rate is well accepted as an index figure in many commercial situations. It reflects the cost of money to corporate borrowers. It is appropriate to apply it here. *Its use removes any questions raised by the relationship between HMO-W and its parent.*

(Emphasis added.)

¶ 32. SSM contends that the circuit court used sound reasoning and that the approach suggested by HMO-W would open "a pandora's box of issues." SSM asks: If a court could look to Unity's borrowing rate in this case, what would happen if a holding corporation like HMO-W had five or ten subsidiaries? In that event, SSM queries, "which one [of the subsidiaries] counts?" For that matter, SSM points out that in this very case HMO-W has one other asset, a relatively small insurance agency called Hometown Insurance Services, Inc. SSM asks: Why not factor in the borrowing power of that asset?[13] SSM concludes: "The statutory definition

---

[13] HMO-W owns 80% of the stock in Hometown Insurance Services, Inc. Apart from SSM's characterization of this asset as "relatively small," the parties do not tell us the size of Hometown relative to Unity.

[of interest] does not authorize the court to look beyond HMO-W to its parent corporation or to its subsidiary corporation."

¶ 33. Accordingly, we are asked to review a discretionary decision of the circuit court. We review discretionary decisions under the erroneous exercise of discretion standard. "Discretionary acts are sustained if the trial court 'examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach.' ".*Richards v. Land Star Group, Inc.*, 224 Wis. 2d 829, 848, 593 N.W.2d 103 (Ct. App. 1999) (quoting *Loy v. Bunderson,* 107 Wis. 2d 400, 415, 320 N.W.2d 175 (1982)). "We will generally look for reasons to sustain a trial court's discretionary decision." *Murray v. Murray,* 231 Wis. 2d 71, 78, 604 N.W.2d 912 (Ct. App. 1999) (citation omitted). "Where the trial court fails to adequately explain the reasons for its decision, we will independently review the record to determine whether it provides a reasonable basis for the trial court's discretionary ruling." *State v. Clark,* 179 Wis. 2d 484, 490, 507 N.W.2d 172 (Ct. App. 1993). Still, we generally remand cases to the trial court when the court has exercised its discretion based on a misunderstanding of law or undisputed fact. *See State v. Anderson,* 230 Wis. 2d 121, 144, 600 N.W.2d 913 (Ct. App. 1999).

¶ 34. We agree with HMO-W that the circuit court misused its discretion. If viewed in isolation, the phrase "fair and equitable" in § 180.1301(5) certainly supports the circuit court's use of the prime rate, which all parties agree is a generally used rate among creditworthy business borrowers in the marketplace. "However, when examining a particular phrase in a statute,

we must look at it in light of the entire statute" and we must "construe [the] statute in a manner which gives effect to the legislative intent." *Elliott v. Employers Mut. Cas. Co.*, 176 Wis. 2d 410, 414, 500 N.W.2d 397 (Ct. App. 1993). Therefore, we must consider what the legislature intended by the phrase "fair and equitable *under all of the circumstances.*"

¶ 35.  We agree with HMO-W that the phrase "under all of the circumstances" directs the circuit court to consider the circumstances of the particular case. The circumstances here include the fact that HMO-W itself did not borrow funds, but its main asset, Unity, could and did borrow at the LIBO Rate. Rather than consider this a circumstance favoring HMO-W, the circuit court dismissed the LIBO Rate as unreliable because "[t]ransactions between related parties may not be indicative of market factors," and use of the higher prime rate "removes any questions raised by the relationship between HMO-W and its parent." The circuit court was plainly saying that there is something suspect about a low interest rate that is the product of the borrowing power of a parent corporation. This reasoning was erroneous because, under some circumstances, our legislature directs that favorable rates of exactly this type be used.

¶ 36.  For example, what if Unity, rather than HMO-W, had been the surviving corporation of the challenged corporate action?  In  that  event, § 180.1301(5) would have unambiguously directed that Unity's borrowing rate, the LIBO Rate, be used. This would be true even if the favorable LIBO Rate was only available to Unity because of a parent corporation's borrowing power. SSM does not argue otherwise. If use of a low rate, available only by virtue of a surviving corporation's relationship with other entities, is re-

quired by the legislature to be used under some circumstances, it does not follow that the circuit court in this case could logically deem the LIBO Rate to be unreliable or questionable because it flows from the borrowing power of HMO-W's related entities. Simply stated, the circuit court's skepticism of an interest rate influenced by a parent company is not shared by the legislature.

¶ 37. We emphasize the limited nature of the dispute and, correspondingly, the limited nature of our holding. Our attention is directed at a particular circumstance and we hold that the circuit court misused its discretion by failing to consider that particular circumstance as a factor favorable to HMO-W. At the same time, we reject HMO-W's contention that the circuit court was *required* to use the LIBO Rate as the "fair and equitable" rate under § 180.1301(5). On remand, the circuit court might determine that HMO-W effectively had access to the LIBO Rate because of Unity's access to that rate and that this circumstance favors use of the LIBO Rate. On the other hand, the circuit court might give weight to competing considerations, such as SSM's argument that Unity was not HMO-W's only asset, and determine that a different rate is appropriate. Indeed, we see nothing inherently unfair about the application of the prime rate in this case. However, the imposition of the prime rate or any other interest rate is a matter of discretion delegated to the circuit court, not this court. Our direction to the circuit court is only that it once more consider the matter in light of all the relevant circumstances, giving the weight it deems appropriate to the borrowing

interest rates available to and borrowing history of HMO-W's major asset, Unity.[14]

## *Conclusion*

¶ 38. For the foregoing reasons, we affirm the circuit court's application of the definition of interest contained in § 180.1301(5) to the time period ending when final payment is made by HMO-W following entry of judgment. We reverse and remand on the issue of the "fair and equitable" interest rate. On remand, the circuit court must consider "all of the circumstances," including the LIBO Rate available to Unity, in setting a "fair and equitable" interest rate.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.

¶ 39. DYKMAN, J. (*dissenting in part*). I disagree

---

[14] Judge Dykman's dissent asserts that, under the majority's analysis, Wis. Stat. § 180.1301(5) "reads something like: '[I]f none, at a rate that the corporation's parent or subsidiary corporation pays.' " Dykman Dissent at ¶ 43. This mischaracterizes our decision. We do not suggest that if the circuit court had considered the LIBO Rate as a favorable factor for HMO-W, yet still decided in its broad discretion to use the prime rate, such a decision would have been an erroneous exercise of discretion.

Similarly, the remainder of Judge Dykman's dissent is based on mischaracterizations of the majority opinion or the record. To take one more example, Judge Dykman disputes our conclusion that the circuit court considered the LIBO Rate as a negative. Dykman Dissent at ¶ 39. However, the circuit court language he quotes clearly demonstrates that the court disregarded the LIBO Rate because it believed the rate was unreliable. Dykman Dissent at ¶ 40. Since we disagree with Judge Dykman's assertions about the circuit court's comments, it follows that we disagree with his criticism of our decision in that regard.

with the majority's conclusion in the cross-appeal that the trial court erroneously exercised its discretion by adopting the prime rate as a rate that was "fair and equitable under all of the circumstances." WIS. STAT. § 180.1301(5) (2001–02).[1] One can hardly think of a more discretionary standard than "fair and equitable." But the majority looks, not for reasons to affirm the trial court, but for reasons to reverse, though it recognizes that it is to do the opposite. *Murray v. Murray*, 231 Wis. 2d 71, 78, 604 N.W.2d 912 (Ct. App. 1999). It does this by interpreting the trial court's opinion as "plainly saying that there is something suspect about a low interest rate that is the product of the borrowing power of a parent corporation." Majority at ¶ 35. That is not what the trial court said.

¶ 40.   The trial court's opinion reads:

Transactions between related parties may not be indicative of market factors. Consequently, the court believes that the most acceptable rate for consideration would be the prime rate. This rate is well accepted as an index figure in many commercial situations. It reflects the cost of money to corporate borrowers. It is appropriate to apply it here. Its use removes any questions raised by the relationship between HMO-W and its parent.

¶ 41.   The trial court was looking to market factors to determine what rate would be fair and equitable. It decided not to use a rate influenced by the relationship between a parent and a subsidiary corporation, and not by market factors. It found that the prime rate was used in many commercial transactions and that the

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

prime rate reflects corporate borrowing reality. I find nothing unreasonable or irrational about this reasoning.

¶ 42. What the majority has done is to amend the statute. WISCONSIN STAT. § 180.1301(5) requires that the court first determine whether the corporation pays interest on its bank loans. If it does, no inquiry is made into whether the rate of interest paid is "fair and equitable." The rate paid is the rate to be paid. But if the corporation does not pay interest, the rate it might have paid, or the rate its parent corporation, sibling corporation, subsidiary or office-sharing corporation pays or might pay or once paid is not relevant. The only question then is what rate is "fair and equitable under the circumstances."

¶ 43. What the majority has done is to somehow link the rate a parent corporation pays with a fair and equitable rate. While I can see a trial court doing that to determine the fair and equitable rate, the statute does not require the trial court to do so. Under the majority's analysis, WIS. STAT. § 180.1301(5) reads something like: "[I]f none, at a rate that the corporation's parent or subsidiary corporation pays." The result is that discretion has been squeezed out of the statute and replaced by a rule of law.

¶ 44. Would the majority have reached the same result if Unity borrowed money at prime plus two percent? Would it have reversed the trial court's discretionary decision to use the prime rate then? That result seems preordained under WIS. STAT. § 180.1301(5), which, under the majority's decision, now effectively requires adoption of related corporations' borrowing rates. Could the trial court consider that most corporate borrowing is done at the prime rate making that a fair and equitable rate, omitting the reason the majority has

97

found objectionable? The majority doesn't tell us, but it is evident that the LIBO rate plays a significant part in the majority's analysis of the issue here.

¶ 45. These questions are obviated by interpreting Wis. Stat. § 180.1301(5) as it was written, resulting in an affirmance of this cross-appeal. Because that is not the result the majority reaches, I respectfully dissent.

¶ 46. ROGGENSACK, J. (*dissenting in part*). Because I conclude that the majority opinion erroneously interprets the dissenters' rights subchapter of Wis. Stat. ch. 180 (2001–02)[1] in regard to postjudgment interest, I respectfully dissent from that part of the decision. However, I do agree with the majority opinion in regard to the cross-appeal.

**Standard of Review.**

¶ 47. The resolution of the appeal turns on questions of statutory interpretation that we resolve *de novo. Thielman v. Leean*, 2003 WI App 33, ¶ 6, 260 Wis. 2d 253, 659 N.W.2d 73. Additionally, whether a statute is ambiguous is a question of law that we review without deference to the circuit court. *Id.*

**Dissenters' Rights Statutes.**

¶ 48. At issue in the appeal are the interpretations of several sections of ch. 180 that relate to a shareholder, SSM, exercising statutory dissenters' rights in its shares of HMO-W because of a merger between HMO-W and UWS Acquisition. The interpre-

___

[1] All further references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

tations of all sections at issue are driven by the definition of "interest" found in WIS. STAT. § 180.1301(5). The question presented in the appeal is whether the § 180.1301(5) definition of interest applies only to prejudgment interest or whether it also applies after a judicial determination of fair value.

¶ 49.   When we are asked to apply a statute whose meaning is in dispute our goal is to give effect to the intent of the legislature. *Truttschel v. Martin*, 208 Wis. 2d 361, 365, 560 N.W.2d 315, 317 (Ct. App. 1997). We begin with the plain meaning of the language used in the statute. *Id.* If that language is capable of being understood by two well informed persons in two or more ways, it is ambiguous. *D.S. v. Racine County*, 142 Wis. 2d 129, 134, 416 N.W.2d 292, 294 (1987). We also consider the interaction of the statute under consideration with other statutory provisions and case law interpreting those provisions because a statute that appears unambiguous on its face may become ambiguous as it interacts with other statutes. *See State v. White*, 97 Wis. 2d 193, 198, 295 N.W.2d 346, 348 (1980).

¶ 50.   Even though I disagree with the majority opinion, for the reasons set forth below, I conclude that WIS. STAT. § 180.1301(5) is not ambiguous. However, in order to understand why that is so, it is helpful to understand the extensive changes in corporate law that were made to ch. 180 in 1990 and the model upon which those changes were based. In 1990, Wisconsin enacted 1989 Wis. Act 303, WIS. STAT. §§ 180.1301–180.1331, as part of a complete revision of Wisconsin's Business Corporation Law. The statutory reorganization of subchapter XIII addressing dissenters' rights that is at issue here was taken in large part from the Revised Model Business Corporation Act (Revised Model Act). *See* Clay R. Williams & Christopher S. Berry,

*Wisconsin's Business Corporation Law,* 63 Wisconsin Lawyer 10, 10 (June 1990).

¶ 51. The dissenters' rights subchapter of the Revised Model Act attempted to address the tension between corporate management's efforts to move a corporation into new enterprises that at times could rearrange investors' rights and the desire of investors to continue in the corporate form and enterprise style of the company in which they initially invested. REVISED MODEL BUSINESS CORPORATION ACT ch. 13, introductory cmt. (1984). The Revised Model Act resolved this tension by giving management of corporations, who have the support of the majority of the shareholders, an almost unlimited power to change the shape of the corporate enterprise, while also giving those shareholders who dissented from the changes the right to withdraw their investments at a fair value. *Id.* The Revised Model Act sought to motivate corporate management and dissenting shareholders to settle their disputes in private negotiations by a voluntary payment, encompassing fair value and accrued interest, accompanied by documentation sufficient to evaluate the corporation's determination of fair value, as well as how interest was calculated. Judicial resolution of the payment due for the dissenters' shares was to be used only as a last resort. Henry F. Johnson & Paul Bartlett, Jr., *Is a Fistful of Dollars the Answer? A Critical Look at Dissenters' Rights Under the Revised Model Business Corporation Act,* 12 J.L. & Com. 211, 220 (Spring 1993).

¶ 52. Like the Revised Model Act, Wisconsin's subchapter on dissenters' rights was devised to operate without a judicial determination of fair value, in most cases. As part of that scheme, it contains definitions that are applicable only to that subchapter of ch. 180. WIS. STAT. § 180.1301. The terms defined, and the

100

definitions used, are almost identical to those used in § 13.01 of the Revised Model Act. The definition for "interest," found in § 180.1301(5), is at the heart of this appeal. It states in relevant part:

> "Interest" means interest from the effectuation date of the corporate action until the date of payment, at the average rate currently paid by the corporation on its principal bank loans or, if none, at a rate that is fair and equitable under all of the circumstances.

Section 180.1301(5).

¶ 53. The majority focuses on the terms, "date of payment," and concludes that the phrase means payment before and after judgment. In so doing, it engrafts the interest definition of WIS. STAT. § 180.1301(5) onto WIS. STAT. § 814.04(4) and WIS. STAT. § 815.05(8), which establish rates of interest after a judicial determination of the principal amount due. However, § 180.1301 explicitly states that the definitions of § 180.1301 apply only to WIS. STAT. §§ 180.1301 to 180.1331. The majority opinion also overlooks the importance of WIS. STAT. § 180.1325, entitled "Payment" which is a major component of the anticipated extra-judicial operation of revised subchapter XIII of ch. 180, as well as the numerous other sections that address "payment" for a dissenter's interest. *See* WIS. STAT. §§ 180.1321, 180.1323, 180.1328 and 180.1330.

¶ 54. WISCONSIN STAT. § 180.1325 speaks solely to voluntary payment by a corporation to those dissenting shareholders or beneficial shareholders who held shares before the effective date specified in the dissenters' notice. WIS. STAT. § 180.1323(1). Section 180.1325 requires current financial information sufficient to permit the shareholders to evaluate the payment of fair value and the calculation of the interest included in the

101

payment the corporation has made. For example, § 180.1325 requires that the balance sheet provided be from the "fiscal year ending not more than 16 months before *the date of payment* . . . ." Section 180.1325(2)(a) (emphasis added). In my view, the "date of payment" used in WIS. STAT. § 180.1301(5)'s definition of interest is the same "date of payment" spoken to in § 180.1325(2)(a) and referred to as "amount paid" in § 180.1330(5)(a).

¶ 55. Many subsequent dissenters' rights procedures are triggered by the WIS. STAT. § 180.1325 "payment." For example, a dissenter who does not agree with the "payment made" must notify the corporation in a timely fashion of what she/he believes are the fair value and correct calculation of interest, WIS. STAT. § 180.1328(1), or she/he waives the right to contest the payment made. Section 180.1328(2). Furthermore, throughout subchapter XIII the term, "payment," always includes both fair value and interest, whether it is the payment made to a shareholder under § 180.1325, or notice given under WIS. STAT. § 180.1322, or duty to demand payment under WIS. STAT. § 180.1323, or the withholding of payment under WIS. STAT. § 180.1327, or the procedure to follow if dissatisfied with payment under § 180.1328 or the payment a court is to order under WIS. STAT. § 180.1330. However, a statute directing that a court is to impose judgment for an amount by which the fair value plus interest exceeds what the corporation has paid or offered, as is done in § 180.1330(5), does not explicitly provide that the *resultant judgment* will run at a rate of interest different from that already set in WIS. STAT. § 814.04(4) and WIS. STAT. § 815.05(8).

¶ 56. Additionally, although we have not directly addressed the question presented by this appeal, we

have previously held that the "payment date" for a payment of fair value and interest made under WIS. STAT. § 180.1325 is the date the shareholder receives the check, even when the shareholder objects to the amount of the payment and seeks additional remuneration. *Kohler Co. v. Sogen Int'l Fund, Inc.*, 2000 WI App 60, ¶ 20, 233 Wis. 2d 592, 608 N.W.2d 746. Our decision in *Kohler* is consistent with my view that the terms, "date of payment" and "payment," used in the dissenters' rights subchapter refer to the same payment of fair value and interest described in the many other sections of that subchapter that address dissenters' rights. It does not refer to payments made after judicial decision.

¶ 57. Furthermore, I read *Burlington Northern Railroad Co. v. City of Superior*, 159 Wis. 2d 434, 464 N.W.2d 643 (1991), as consistent with the premise that the interest provisions in WIS. STAT. § 815.05(8) control every judgment, unless a statute or a contractual provision explicitly states that another rate of interest is to be used after a judicial determination. As the supreme court explained:

> [W]e conclude that sec. 815.05(8) establishes the post-judgment interest rate for every judgment for which the legislature has not *explicitly provided a different postjudgment interest rate.*

*Burlington Northern*, 159 Wis. 2d at 442, 464 N.W.2d at 646 (emphasis added). WISCONSIN STAT. § 180.1301(5) does not "explicitly" provide for postjudgment or post verdict interest. Rather, it provides for interest to the "date of payment," a term repeated in subchapter XIII to which we accorded a specific meaning in *Koehler.* That § 815.05(8) controls interest after judgment is also consistent with the doctrine of merger, which provides that when a litigant obtains a judgment, his original

claim is extinguished and the rights flowing from the judgment are substituted for the claim. *See Production Credit Ass'n v. Laufenberg*, 143 Wis. 2d 200, 204–05, 420 N.W.2d 778, 779 (Ct. App. 1988).

¶ 58. There is also a difference in regard to when an explicit legislative directive is set out in ch. 180's terms and *Weiland v. DOT*, 62 Wis. 2d 456, 215 N.W.2d 455 (1974), on which the majority relies for most of its reasoning. *Weiland* arises out of a WIS. STAT. ch. 32 condemnation proceeding, and it turns on the meaning of WIS. STAT. § 32.05(11)(b) (1969), that states in relevant part:

> If the *jury verdict as approved by the court* exceeds the basic award, the appellant shall have *judgment for the amount of such excess plus legal interest thereon* to date of payment in full . . . .

*Weiland*, 62 Wis. 2d at 461, 215 N.W.2d at 457 (emphasis added). By its very terms, § 32.05(11)(b) applies to interest after a judicial determination until payment. Therefore, § 32.05(11)(b) took the interest provisions of WIS. STAT. §§ 814.04(4) and 815.05(8) out of play. Stated another way, § 32.05(11)(b) "explicitly provided a different postjudgment interest rate," just as *Burlington Northern* explains. *See Burlington Northern*, 159 Wis. 2d at 442, 464 N.W.2d at 646. Additionally, *Calaway v. Brown County*, 202 Wis. 2d 736, 553 N.W.2d 809 (Ct. App. 1996), a later case that also interpreted § 32.05, but under subsec. 10(b), confirms that § 32.05(11)(b) is a statute that explicitly provides for postjudgment interest.

¶ 59. In *Calaway*, we were asked to decide whether postjudgment interest of twelve percent was due for a condemnation judgment under WIS. STAT. § 32.05(10)(b) that states in relevant part:

> The court shall enter judgment for the amount found to be due after giving effect to any amount paid by reason of a prior award. The judgment shall include legal interest on the amount so found due from the date of taking if judgment is for the condemnor, and from 14 days after the date of taking if judgment is for the condemnee.

*Calaway*, 202 Wis. 2d at 755, 553 N.W.2d at 817. We interpreted this provision as an entitlement to prejudgment interest, but not having any bearing on the rate of postjudgment interest. *Id.* at 755–56, 553 N.W.2d at 817. We cited *Burlington Northern* and concluded that WIS. STAT. § 815.05(8) continued to control postjudgment interest. *Id.* Therefore, the judgment ran at twelve percent interest until paid. We concluded that it was only under § 32.05(11)(b) that the legislature had explicitly stated that the legal rate of interest found in WIS. STAT. § 138.04 applied *after judgment. Id.*

¶ 60.  Just as in our analysis in *Calaway*, I conclude that because WIS. STAT. § 180.1301(5) does not explicitly provide that its definition of "interest" applies after judgment, it does not so apply and WIS. STAT. § 814.04(4) and WIS. STAT. § 815.05(8) continue to control where applicable.[2] Accordingly, for the reasons set

---

[2] I also disagree with the majority's conclusion that the interest spoken to in WIS. STAT. § 180.1330(1) can be expressed as a rate of interest rather than as the amount of accrued interest that is due. Majority at ¶ 11. To me, such an interpretation is contrary to what the legislature hoped would be a self-help statute for corporations and shareholders where a dollar amount payment would be made to those dissenters who have complied with their obligations under the statutes and they could take it or respond with a dollar amount for fair value and accrued interest the shareholder believed was appropriate. *See* WIS. STAT. §§ 180.1325 and 180.1328.

out above, I would reverse the decision of the circuit court on the appeal and I respectfully dissent from the majority opinion.